IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JERRY L. GENTRY                                                                                         PLAINTIFF

v.                                            Civil No. 4:23-cv-01095-BAB

GEAN SEIGER[1]; TOMMY ROGERS;
LEROY MARTIN; and JERRY MANESS                                                    DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This is a civil rights action filed *pro* se by Plaintiff, Jerry L. Gentry., under 42 U.S.C. § 1983. On April 3, 2024, the parties consented to have the undersigned conduct all proceedings in this case including a jury or nonjury trial and to order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 31). Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 42). Plaintiff filed a Response. (ECF No. 51).

**I.   BACKGROUND**

Plaintiff originally filed his Complaint and application to proceed *in forma pauperis* ("IFP") in the Eastern District of Arkansas on October 4, 2023. (ECF No. 2). The case was transferred to this Court on October 19, 2023, (ECF No. 3), and the Court granted Plaintiff IFP status on the same day, (ECF No. 6).

---

[1] The Clerk of the Court is directed to correct Defendant Gean Seiger's name in the case heading on the docket as it is misspelled. According to her Affidavit, her name is spelled Seiger and not Sieger. (ECF No. 42-2).

## A. Plaintiff's Claims

In his Complaint, Plaintiff names Defendants Gean Seiger, Jail Administrator of the Columbia County Detention Center ("CCDC"); Tommy Rogers, Jailer at the CCDC; LeRoy Martin, Sheriff of Columbia County; and Jerry Maness, Chief Deputy of the CCDC. Plaintiff alleges his claims against all these Defendants in both their individual and official capacities. (ECF No. 2, pp. 1-2). Plaintiff first claims he was denied medical care on August 7, 2023. Specifically, Plaintiff states:

> On 8-07-23 I was push down from behind, that cause bodily harm to me twisted ankle, fracture collarbone, catching Dizzy spell all the time, and chest pain. the Jailer Tommy Rogers told the Sheriff, Chief Deputy and the Jail Administration of what had happen, they all came to talk to me I explain to them of what Had taking place, they look and said yes I do see swellen, but I was still denied medical attention.

(ECF No. 2, p. 4) (errors in original). Plaintiff then complains of another incident on a separate day without providing the date:

> I got up one morning and stood up and that all I remember, I past out, Jailer T. Rogers and Josh came in and took me out of the Pod 2 I couldn't gain conscious, they put smelling salt under my nose as I was told by Jailer, but never came to, Mrs. Gean Seiger had some type of object and put it in my chest and start grinning real hard for about 1 ½ minute. When I came to, my chest felt like it had been crush, Mrs. Gean Seiger is No Doctor and she doesn't have no medical Degree in this type of work. She could have kill me without her knowing, my chest was hurting so bad I call Mrs. Gean to the Door and told her of whats was going on and her replied was I'm so tired of you and walk off and slammed the door in front of the Hold Pod 1. I fear for my safety here at this jail.

(ECF No. 2, p. 4) (errors in original). Construing the Complaint liberally, as the Court must, these allegations contain a claim of excessive force and a separate claim of denial of adequate medical care.

For relief, Plaintiff requests:

> My Life is more than they took it to be, 3.5 Million dollars, for all this pain and suffering, assault on me, crush my chest, for not giving me any medical attention, and I have not seen any one that has A Degree in this type of injury.

(ECF No. 2, p. 5) (errors in original).

Plaintiff also attached several documents to his Complaint. These attachments are purported incident reports and affidavits regarding the two incidents described above with Defendant Rogers and Defendant Seiger. The documents are handwritten and not signed by any of the Defendants. (ECF No. 2, pp. 6-13). In these documents, Plaintiff mostly restates the claims he made in his Complaint with a few additional facts the Court finds helpful in understanding Plaintiff's claims.

First, Plaintiff indicates the chest rubbing incident occurred on August 25, 2023. Plaintiff also adds that Defendant Rogers and an unnamed officer took his blood pressure before he passed out on this day. His pressure was 170/147. (ECF No. 2, p. 8). Finally, Plaintiff alleges he has experienced chest pains every day since the August 25, 2023 incident with high blood pressure and trouble breathing. Despite these symptoms, Plaintiff claims he was still denied medical care. *Id*.

Plaintiff also adds he did get an ice pack for his ankle after Defendant pushed him into the pod. (ECF No. 2, p. 10). Plaintiff also alleges his ankle swells all the time after the incident and sometimes he cannot walk on it. His neck hurts and he is constantly dizzy. *Id.*

### B. Defendants' Motion

Defendants filed their Motion for Summary Judgment on August 1, 2024, with a Brief in Support and a Statement of Undisputed Facts. (ECF Nos. 42-44). Defendants argue the undisputed facts here show: (1) Plaintiff has only asserted negligent uses of force and negligence is not a

3

cognizable claim under Section 1983; (2) Defendants actions were objectively reasonable under the Fourth Amendment excessive force analysis; (3) Defendants are entitled to qualified immunity; (4) the video evidence here is indisputable; and (5) Plaintiff has failed to state any official capacity claims. (ECF No. 43). Notably the Defendants do not discuss any claim of denial of adequate medical care.

Defendants assert in their two-page Statement of Undisputed Facts that the video of both incidents are attached as exhibits and that Defendant Roger was not disciplined over the incident. (ECF No. 44). Defendants also state the sternum rub performed by Defendant Seiger lasted less than 5 seconds. *Id.*

### C. Defendants' Affidavits

Defendants also attached three Affidavit's to their Motion. The first is from Ms. Longino attesting to the validity of the video footage submitted. (ECF No. 42-1). The next is from Defendant Seiger. Defendant Seiger testified Defendant Rogers pushed Plaintiff into his pod on August 15, 2023, after ordering Plaintiff to enter several times. Plaintiff refused each order. Defendant Seiger testified she reviewed the video of Defendant Rogers pushing Plaintiff into the pod and determined it did not violate the CCDC's excessive force policy. (ECF No. 42-2, p. 1).

Defendant Seiger also testified in her Affidavit that on August 25, 2023, she performed a sternum rub on Plaintiff that lasted approximately five seconds. She further testified she performed this rub to help Plaintiff not to harm him. She testified she followed her training to assist inmates in the case of life-threatening conditions. (ECF No. 42-2). According to Defendant Seiger, she performed the sternum rub after a non-party officer attempted "smelling salts" to rouse Plaintiff. After the rub, she instructed Plaintiff be placed in a wheelchair and taken to wait on a medic. *Id.* at 2.

Finally, Defendant Rogers testified in his Affidavit that he pushed Plaintiff into the Pod on August 15, 2023. He specifically incorporated into his testimony his incident report on the push which states:

> On August the 15th at around 13:41 PM. After bringing Pod 2 in front yard call, the majority of Pod 2 was banging the other pod windows, yelling, jumping around, and just being plain ole unruly. I called for control to open pod 2 so the inmates could return to their pod. Upon opening the door . . . all of the inmates went in except for Jerry Gentry . . . I kept telling Gentry to get back in the pod, after telling him multiple times . . . I came to the conclusion that he needed a little help getting back across the threshold of the door. So I put my hands on both of Gentrys shoulders and gave him a little push to help him back into the pod. I held both of Gentry's shoulders because I knew he would try to fall. I push him just enough so he would step over the metal bar at the bottom of the door and return to the pod, instead Gentry slid his right foot up against the metal bar . . . put his right arm out to break his fall and fell to the floor . . . Later on during the day Gentry requested an ice pack for his knee he claimed was swollen. Gentry laid in bed for a day or so and was back up walking, sitting at the table playing cards, and i even caught him running to the door to catch me before I got out of sight because he wanted me to make some copies of some legal papers which i told him I could not do.

(ECF Nos. 42-3, p. 1; 42-1, p. 9) (errors in original). Defendant Rogers goes on to testify he tried to be gentle with Plaintiff, and he did not intend to push him to the floor or hurt him. Defendant Rogers only intended to get Plaintiff into the pod. *Id*. at 2.

### D. Video Footage

The video footage submitted by Defendants clearly shows both incidents. The first video is less than two minutes. It starts with Defendant Rogers and Plaintiff walking down the hall to the pod door. There is no audio with this video, but the Court observes Plaintiff and Defendant Rogers interacting. Plaintiff acts like he doesn't want to walk down the hallway and Defendant Rogers pushes on Plaintiff twice to get him to move toward the pod door. Plaintiff leans his bodyweight back into the pushes and even turns around once and flinches at Defendant Rogers in a playful manner. Plaintiff is smiling and neither of the hallway shoves cause Plaintiff to lose his

balance. The Cour cannot see Defendant Rogers face because he is wearing a mask. (Video One, ECF No. 42-2, p. 11).

Once they arrive at the pod door Defendant Rogers gestures to the pod door to indicate Plaintiff should go inside. Plaintiff is the last inmate left to go into the pod, and Defendant Rogers gestures three times before another inmate comes back out of the pod door and starts a conversation with Defendant Rogers. After that conversation, Defendant Rogers gestures again for Plaintiff to enter the pod. Plaintiff still does not enter. Defendant Rogers then moves a large fan that is in front of the pod door. He comes back and to asks Plaintiff to go into the pod at least four additional times (the Court infers this as there is no audio but Defendant Rogers gestures with his hands toward the pod door). When Plaintiff continues to refuse, Defendant Rogers puts one hand on Plaintiff's back and pushes him toward the open pod door. Plaintiff then falls into the pod. There is no camera view inside the pod so the Court cannot see Plaintiff inside the pod. However, it is undisputed Plaintiff fell on the floor inside the pod. *Id.*

It is clear from the video footage the shove was not forceful. The Court further notes the shove into the open pod door did not appear as strong as the two in the hallway where Plaintiff not only maintained his balance but jumped back around and flinched at Defendant Rogers in a playful manner. *Id.*

The second video is approximately 30 minutes in length. It begins with a non-party officer entering Plaintiff's pod to get him out of bed. Plaintiff is slumped over in his bed not responding to the officer. After approximately two minutes the non-party officer gets Plaintiff out of his bed with help from another inmate. While it is difficult to tell from the viewpoint of the officer's body camera, it appears he carried Plaintiff out of the pod and down the hallway to a chair. At time stamp 2:40, the non-party officer attempts to rouse Plaintiff through talking to him and taps to his

6

face. He is unsuccessful. He then proceeds to take Plaintiff's blood pressure. The officer states Plaintiff's blood pressure is 170/97 with a pulse of 71 at time stamp 4:07. The officer then continues to try and rouse Plaintiff by calling his name and telling him he will have to get ammonia to wake him up if he doesn't come around. At time stamp 4:55, Plaintiff begins to talk back to the officer telling him something is wrong with his head, neck, and he is dizzy. At time stamp 5:25, the officer asks if Plaintiff would like some medicine, and Plaintiff responds no "I need to see somebody something ain't right with me." The officer explains he cannot give that type of order but will see what he can do. The officer then tells someone behind the glass what Plaintiff's complaints are and shows the blood pressure reading. (Video 2, ECF No. 42-2, p. 11).

At time stamp 6:50, the non-party officer explains to a female on the radio the situation with Plaintiff. Her response is inaudible. The officer again tries to rouse Plaintiff, and Plaintiff turns his head towards the officer but does not speak. At time stamp 8:05, the female can be heard on the officer's radio saying: "He wasn't like that awhile ago when he was raising hell down there was he?" The officer responded: "no." Plaintiff can be seen breathing and moving a bit while sitting in the chair. He also maintains his seated position in the chair leaned up against the wall. *Id.*

Approximately eight minutes pass while the officer waits on smelling salts and then goes to look for the smelling salts himself. At time stamp 17:19 the non-party officer, while looking for ammonia strips, can be heard saying "he is just pretending but I am about to shock his ass when I put them in his nose." *Id.* When the non-party officer finds the salts and returns, he warns Plaintiff he is about to give him the smelling salts. The officer sticks the smelling salts under Plaintiff's nose at 19:34. Plaintiff begins turning his head side to side at 19:47. Then, Plaintiff begins coughing but still will not respond to the officer. Plaintiff then starts moaning. The officer

7

can be heard saying "Gentry look at me" and "Gentry open your eyes." Plaintiff does not respond any further despite the officer continuing to keep the smelling salts under his nose. At time stamp 23:05, Defendant Seiger enters and asks the officer if he checked Plaintiff's blood pressure. He responded he did. She instructs the officer to check it again, but she actually checks it herself. The officer then walks off to get a cup of ice, and the video does not indicate what Plaintiff's second blood pressure reading indicated. When the officer gets back to Plaintiff another inmate has a wheelchair ready.

At 25:20, Defendant Seiger returns from off camera and begins rubbing on Plaintiff's chest. The Court is unable to tell if she has anything in her hand while rubbing. Plaintiff claims she did, and Defendant Seiger's Affidavit is silent on this fact. Defendant Seiger asks, while rubbing Plaintiff's chest: "Gentry you with me, you with me?" She rubs two times over the course of seven seconds. Plaintiff responds by moaning. Neither rub appears forceful on the video. Defendant Seiger then orders Plaintiff shackled and taken to intake for medics. Two other inmates and the same non-party officer take him to the front and the officer puts cuffs and leg shackles on him. *Id.* The video is turned off. *Id.* There is no indication on the record whether Plaintiff received any evaluation by medics.

Defendants also attached the CCDC Grievance Procedure. (ECF No. 42-2, p. 10). However, the Court will not enumerate it here as the Grievance Procedure is not at issue in this matter.

### E. Plaintiff's Response

Plaintiff filed his Response on September 25, 2024. (ECF No. 51). While Plaintiff's response is filed as one document it includes two separate responses. In his first Response, Plaintiff reasserts the facts stated in his Complaint regarding Defendant Rogers's push. He also reasserts

8

the fact that Defendant Martin came to see him after he fell and told him: "All hell you'll be alright, all you need is [an] ice pack." (ECF No. 51, p. 2). Then Plaintiff states that he was in so much pain from the fall that he could not maintain consciousness. He states Defendant Rogers, and another officer had to drag him down the hallway to have his blood pressure checked. Plaintiff states his blood pressure was 170/97 but the officers still would not call 911. (ECF No. 51, pp. 2-3). Finally, Plaintiff argues: "As you can see from all the video footages, I had a sever fatal incident. I was denied medical attention at every incident that I went [through] . . .." (ECF No. 51, p. 3). Plaintiff then argues the video footage supports his claims. *Id.* The Court interprets Plaintiff's Response to allege Defendant Roger's push caused the later medical incident on August 25, 2023.

Next, in his second Response, Plaintiff presents arguments and assertions related to his claims of excessive force. (ECF No. 51, pp. 6-8). Plaintiff does not offer any additional facts than those asserted in his Complaint. Plaintiff again states the video footage supports his claims showing excessive force was used. *Id.*

## II.    LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607. "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted). "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.* Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.* To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

## III.   DISCUSSION

First, the Court notes Defendants did not move for summary judgment on Plaintiff's denial of medical care claims. Plaintiff clearly alleges a denial of medical care claim related to both incidents in his Complaint. (ECF No. 2, pp. 4, 5). The denial of medical care claim is asserted against Defendants Seiger, Maness, and Martin regarding Plaintiff's injuries sustained on August 15, 2023 from the fall and against Defendant Seiger regarding the chest injury after the sternum rub. *Id*. Accordingly, the Court need not address these claims herein.

Next, the Court notes, Plaintiff asserts his excessive force claims against Defendant Rogers for the shove on August 15, 2023 and Defendant Seiger for the sternum rub on August 25, 2023. He does not allege any excessive force claims against Defendants Maness and Martin. Accordingly, the Court need only address herein Plaintiff's excessive force claims against Defendants Rogers and Seiger, and Plaintiff's official capacity claims regarding the excessive force which Defendants moved to dismiss on summary judgment.

### A.  Qualified Immunity

Defendants have claimed qualified immunity against Plaintiff's excessive force claims. Qualified immunity "shields [a] government official[] from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). "At summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Watson*

11

*v. Boyd,* 2 F.4th 1106, 1109 (8th Cir. 2021) (internal citation and quotations omitted). The Court may use its discretion in determining which of these two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If a constitutional right was not clearly established at the time of deprivation, then the Court need not determine whether the particular plaintiff's constitutional rights were violated based on the facts before it because the defendant is entitled to qualified immunity regardless. *See Dimock, v. City of Brooklyn, et. al,* No. 24-1728, 2024 WL 5220190, *3 (8th Cir. Dec. 26, 2024).

For this analysis, the Court looks to the law at the time of the incident in August 2023. The Supreme Court has cautioned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citation and quotation omitted). A right is clearly established if it is sufficiently clear for every reasonable official to understand the actions would violate a constitutional right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotations omitted). The case precedent must not be directly on point, but it must place the constitutional question beyond debate. *White*, 580 U.S. at 79 (internal citation and quotation omitted). The Eighth Circuit recently expounded on this standard by explaining "[a] clearly established right is dictated either by controlling authority or a robust consensus of cases of persuasive authority." *Dimock*, 2024 WL 5220190 at *2 (internal quotations and citations omitted). The *Dimcok* Court went on to explain the legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id*.

### B. Excessive force

It is the Fourteenth Amendment's Due Process Clause that protects Plaintiff as a pretrial detainee. The objective reasonableness standard applies to excessive force claims brought by pretrial detainees. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). This is the same

12

objective reasonableness standard that applies to arrestees under the Fourth Amendments. *Andrewes v. Neer,* 253 F.3d 1052, 1060 (8th Cir. 2001). "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove." *Kingsley,* 576 U.S. at 395. A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-7.

The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Additionally, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

"[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Id.* at 398-99.

The court must analyze each of Plaintiff's purported uses of force under this legal standard to determine if Defendant Rogers and Defendant Seiger were objectively reasonable in each of the purported use of force.

### 1. Forcing Plaintiff into the pod

Plaintiff claims Defendant Roger's shoving him into the pod constituted excessive force in violation of his constitutional rights. Defendants argue, Defendant Rogers' action of shoving Plaintiff into the pod was objectively reasonable. Thus, he is entitled to qualified immunity.

Viewing the evidence in the light most favorable to Plaintiff, as the Court must on summary judgment in considering qualified immunity, the Court finds Defendant Rogers is entitled to qualified immunity on Plaintiff's excessive force claim against him. The material facts here are undisputed and the incident is clearly displayed on the video footage. While force was clearly used here, Defendant Rogers only lightly shoved the Plaintiff into the pod after Plaintiff repetitively refused to enter on his own. *Compare Crumley v. St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates" the Constitution) (internal quotation marks and citation omitted). There is no indication in the video that more force was used than necessary or that the force was in anyway used to punish Plaintiff. *Bell*, 441 U.S. at 539 n. 21 ("There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned"). *See also Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999) ("Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it").

Furthermore, Plaintiff refused multiple orders to enter the pod. The Court counted at least nine times Defendant Rogers gestures in asking Plaintiff to enter the pod. Plaintiff refused each one. An inmate refusing orders to be locked down clearly poses a security risk to the CCDC. *See*

*Kinsley,* 576 U.S. at 397 (internal citations omitted).  Defendant Rogers needed to regain control of Plaintiff for the legitimate governmental interest of maintaining order and security at the CCDC. *Id.* at 398-99.  The Court finds Defendant Rogers acted as any reasonable officer would have acted in the circumstances.  Moreover, harsher uses of force have been held reasonable in similar situations.  S*ee Porter v. Cape Girardeau County*, 2022 WL 990676, *6-7 (E.D. Mo. Mar. 31, 2022) (finding objectively reasonable the tasing and choke hold of a detainee for refusing multiple orders to enter his cell).

The Court recognizes, Plaintiffs allegations of serious injuries from his fall into the pod (broken collar bone, twisted ankle, and dizzy spells), however, the extent of Plaintiff's injury is just one factor to consider under *Kingsley*.  576 U.S. at 397-99.  This factor does not outweigh the Court's consideration of the video footage showing the entirety of the incident and the minimal amount of force used, and the legitimate interest in maintaining the security of the.  *Id.*

Accordingly, the Court finds Defendant Rogers' use of force in pushing Plaintiff into the pod was objectively reasonable and does not rise to the level of a constitutional violation.  Without a constitutional violation, Defendant Rogers is entitled to qualified immunity under the first prong of the qualified immunity analysis, and the Court need not determine whether the particular right is clearly established under the second prong.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 2. The chest rub

Plaintiff claims that Defendant Seiger's use of a chest or sternum rub on August 25, 2023 constituted excessive force in violation of his constitutional rights.  Defendants argue Defendant Steiger's actions in performing the sternum rub were objectively reasonable under the circumstances and she is entitled to qualified immunity.

Viewing the evidence in the light most favorable to Plaintiff, as the Court must on summary judgment in considering qualified immunity, the Court finds Defendant Seiger is entitled to qualified immunity on Plaintiff's excessive force claim against him. While Plaintiff disputes Defendant Seiger's assertion that the chest or sternum rub lasted a mere five seconds, the video evidence clearly shows the sternum rub was no more than seven seconds. The Court need not defer to Plaintiff's version when it is directly contradicted by video evidence on the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Furthermore, Plaintiff does not dispute any other facts presented in the video, such as his unresponsiveness and the non-party officer's continuous attempts to rouse him prior to Defendant Seiger's application of the sternum rub. (ECF No. 51).

Again, there is no dispute that force, through a sternum rub, was used here by Defendant Seiger. "A sternum rub is accomplished by applying pressure with the knuckles upon a person's sternum" and has been described as a "medical procedure designed to rouse an unresponsive patient." *Norman v. Lewis,* 2019 WL 407426, n. 2 (W.D. Ark. Jan. 31, 2019) (quoting *Young v. Harrison,* 284 F.3d 863, 866 n. 2 (8th Cir. 2002); *Scheffler v. Lee,* 2018 WL 4849690, at *2 (6th Cir. Oct. 5, 2018)). Therefore, the question before the Court is whether Defendant Seiger's administration of the sternum rub on Plaintiff, who presented as unresponsive for approximately twenty minutes prior, was objectively reasonable.

Applying the *Kingsley* factors the Court finds the seven second sternum rub was a minimal amount of force used to further the legitimate interest stated by Defendant Seiger in her Affidavit— to help Plaintiff during a medical emergency. Additionally, it is undisputed Defendant Seiger is

16

trained on how to administer a sternum rub in order to assist inmates and detainees in life threatening situations, and the video clearly demonstrates it was not performed with unnecessary force. (ECF No. 42-2, p.6). The Court also finds notable that the non-party officer attempted to rouse Plaintiff for approximately twenty minutes, through various methods such as speaking to Plaintiff, poking Plaintiff, and administering smelling salts, before Defendant Seiger administered the short sternum rub. Accordingly, the Court finds the force used through the sternum rub does not constitute excessive force. *See Kingsley,* 576 U.S. at 397.

The Court has previously addressed sternum rubs on pretrial detainees. In *Pardue,* the Court held a sternum rub administered three times did not constitute excessive force. Instead, the *Pardue* Court determined the sternum rubs, a legitimate medical procedure, were performed in an effort to determine if the plaintiff was suffering from a medical condition and needed medical attention or was malingering. *Pardue v. Glass,* 2008 WL 249173, at *22 (W.D. Ark. Jan. 29, 2008). The Court finds *Pardue* analogous to the circumstances before it as it is clear from the video footage that both the non-party officer and Defendant Seiger believed Plaintiff was malingering.

To the contrary, in *Norman*, the Court found the circumstances surrounding the sternum rub administered created a genuine issue of material fact as to whether the sternum rub constituted excessive force. 2019 WL 407426, at *6. However, those circumstances are distinguishable from the facts presented here. *Norman* included two separate officers applying multiple sternum rubs creating an eight-centimeter wound on the plaintiff's chest which bleed and oozed for approximately one month. *Id*. at 3. Moreover, one of the medics that attended the *Norman* plaintiff called the jail to inform the jail administrator that the sternum rub was performed with "too much pressure . . . and they should not be putting that much pressure when doing [it]." *Id.*

Even though the *Norman* Court found genuine issue of material fact as to whether the sternum rub constituted excessive force, the *Norman* defendants were granted qualified immunity because the Court held:

> There are few cases involving the use of pain stimuli by jailers to determine consciousness, and even fewer discussing whether the use of a sternum rub could constitute excessive force. Fourth Amendment law in general does not suggest that the use of a medical technique by a jailer constitutes excessive force, even if that medical technique is intended to inflict some amount of pain. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. In this case, a reasonable officer would not have understood that the use of sternum rubs violated the Plaintiff's Fourth Amendment right to be free from the use of excessive force.

*Norman,* 2019 WL 407426, at *7 (internal quotations and citations omitted).

Accordingly, the Court finds Defendant Seiger's use of force in rubbing Plaintiff's chest was objectively reasonable. Without a constitutional violation, Defendant Seiger is entitled to qualified immunity under the first prong of the analysis. However, even if the Court proceeded to the second prong of the qualified immunity analysis, Defendant Seiger would still be entitled to qualified immunity because Plaintiff's right to be free from an excessive sternum rub was not clearly established as explained in *Norman.*

### C. Official Capacity

Plaintiff alleges his excessive force claims against both Defendants Rogers and Seiger in both their individual and official capacities. However, he fails to state cognizable official capacity claims against Defendants Rogers and Seiger here.

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In

this case, Plaintiff's official capacity claims against Defendants are treated as claims against Columbia County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Columbia County's liability under Section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). Here, this means Plaintiff must produce summary judgment evidence to show a policy or custom of Columbia County caused his claimed constitutional violations—excessive force.

As the Court has determined the summary judgment record does not support any cognizable constitutional violations regarding Plaintiff's claims of excessive force, there can be no corresponding official capacity claims. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (The Eighth Circuit has consistently recognized without an underlying substantive constitutional violation against a defendant in their individual capacity, a plaintiff cannot be successful on an official capacity claim against that defendant's employer).

### IV. CONCLUSION

For the reasons stated above, I recommend the Defendants' Motion for Summary Judgment (ECF No. 42) be **GRANTED** and Plaintiff's claims for excessive force against Defendant Rogers and Defendant Seiger, in both their individual and official capacities be **DISMISSED WITH PREJUDICE**. Defendant Rogers is hereby **DISMISSED** from this action. This leaves for further litigation only Plaintiff's claim of denial of medical care asserted against Defendants Seiger, Martin, and Maness in both their individual and official capacities.

Should Defendants Seiger, Martin, and Maness wish to file a second Motion for Summary Judgment regarding Plaintiff's denial of medical care claims, the Court will consider a Motion for Leave to do so if filed before April 1, 2025.

**IT IS SO ORDERED this 27th day of February 2025.**

*/s/ Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE